# ORIGINAL

## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | Criminal No.    3:15-CR-278 (TJM) |
| | ) | |
| **v.** | ) | **Plea Agreement** |
| | ) | |
| **BRUCE KANE,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

U.S. DISTRICT COURT - N.D. OF N.Y.
**FILED**
JUN 1 3 2016
AT_____ O'CLOCK
Lawrence K. Baerman, Clerk - Bing.

The United States of America, by and through its counsel of record, the United States Attorney for the Northern District of New York, and defendant **BRUCE KANE** (hereinafter "the defendant"), by and through the defendant's counsel of record, hereby enter into the following plea agreement pursuant to Rule 11(c)(1)(A) of the Federal Rules of Criminal Procedure:

1) **The Defendant's Obligations:**

   a) **Guilty Plea:** The defendant will change the defendant's previously-entered plea of "not guilty" and plead guilty to Count 1 of the indictment in Case No. 3:15-CR-278 (TJM) charging conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349.

   b) **Special Assessment:**  The defendant will pay an assessment of $100 per count of conviction pursuant to 18 U.S.C. § 3013.  The defendant agrees to deliver a check or money order to the Clerk of the Court in the amount of $100, payable to the U.S. District Court, at the time of sentencing.

   c) **Compliance with Other Terms of Agreement:** The defendant will comply in a timely manner with all of the terms of this plea agreement.

   d) **Restitution:** The defendant will consent to entry of an order directing the defendant's payment of restitution in the following amounts to the following victims, whether or not the losses suffered by those victims resulted from the offense of conviction:

| | | |
|---|---|---|
| (1) | G. G. – | $160,000.00 |
| (2) | S. F. P. – | $300,000.00 |
| (3) | S. S. – | $100,000.00 |
| (4) | S. G. – | $400,000.00 |
| (5) | T. O. – | $100,000.00 |
| (6) | U. W. F. – | $1,000,000.00 |
| (7) | J. H. – | $100,000.00 |
| (8) | W. B. – | $2,275,532.00 |
| (9) | R. M. – | $100,000.00 |
| (10) | B. LTD – | $4,175,893.00 |
| (11) | I. P. – | $150,000.00 |
| (12) | T. H. F. – | $300,000.00 |
| (13) | H. C. – | $200,000.00 |
| (14) | G. S. – | $100,000.00 |
| (15) | G. INC. – | $549,373.00 |
| | Total: | $10,010,798.00 |

e) **Forfeiture:** Pursuant to Title 18, United States Code, Section 981(a)(1)(C) by Title 28, United States Code, Section 2461(c), and Title 21, United States Code, Section 853(p), the defendant will consent to entry of an order directing forfeiture to the United States of the property described in the Forfeiture Allegation in the indictment described above, or to any substitute assets, or to a money judgment, all as more fully set out below:

(1) A Money Judgment in the Amount of $10,010,798.00 in U.S. Currency.

2)   **The Government's Obligations:**

   a) **Non-prosecution for other offenses:** For so long as the defendant's guilty plea and the sentence remain in effect, the government will not seek other federal criminal charges against the defendant based on conduct described in the indictment in Case No 3:15-CR-278 (TJM) and/or in the paragraph of this agreement entitled "Factual Basis for Guilty Plea," occurring before the date on which the defendant signs this agreement. This agreement does not prevent the government from seeking charges based on other conduct.

   b) **Compliance with Other Terms of Agreement:** The government will comply in a timely manner with all of the terms of this plea agreement.

3)   **Potential Maximum Penalties:** The defendant understands that the Court can impose the following maximum penalties for the offense to which the defendant agrees to plead guilty and may be required to impose mandatory minimum terms of imprisonment, all as set out below:

   a) **Maximum term of imprisonment:** 20 years, pursuant to 18 U.S.C. § 1349.

   b) **Maximum fine:** $250,000, pursuant to 18 U.S.C. § 3571.

   c) **Supervised release term:** In addition to imposing any other penalty, the sentencing court may require the defendant to serve a term of supervised release of up to 3 years, to begin after imprisonment. *See* 18 U.S.C. § 3583. A violation of the conditions of supervised release during that time period may result in the defendant being sentenced to an additional term of imprisonment of up to 2 years.

   d) **Other adverse consequences:** Other adverse consequences may result from the defendant's guilty plea as further described in paragraph F below.

3

4)      **Elements of Offense:** The defendant understands that the following are the elements of the offense to which the defendant agrees to plead guilty.  The defendant admits that the defendant's conduct satisfies each and every one of these elements.

a)  Two or more persons conspired to commit wire fraud by, with fraudulent intent, devising and intending to devise a scheme and artifice to defraud investors and to obtain money or property by means of materially false or fraudulent pretenses, representations or promises and the use of interstate wires in furtherance of the scheme to defraud, in violation of Title 18, United States Code, Section 1343; and

b)  The defendant joined that conspiracy, either at its inception or sometime during its existence, knowing the purpose of the conspiracy and intending to help it succeed.

5)      **Factual Basis for Guilty Plea:** The defendant admits the following facts, that those facts demonstrate the defendant's guilt for the offense to which the defendant is pleading guilty, and that there are no facts establishing a viable defense to that offense:

a)  After gaining access to over $10 million of investor funds raised by Global Financial Fund 8, LLP ("GFF8"), a limited liability partnership, KANE, in conjunction with Burton Greenberg ("Greenberg"), and Senol Taskin ("Taskin") improperly diverted the GFF8 principal for their own use and personal enrichment and lied to investors regarding the safekeeping, profitability, and use of the GFF8 principal by making and causing to be made (a) false and fraudulent "profit" payments to investors and (b) misrepresentations and false promises, orally and in writing, to the investors to conceal their improper diversions and lull the investors into a false sense of security that their investments were whole and held in an Italian bank and had generated significant profits, when, as Greenberg, Taskin and KANE then well knew, they had improperly diverted and

4

continued to improperly divert GFF8 principal for their own use and personal enrichment.

b) From 2001 through 2013, Greenberg, a resident of Plantation, Florida, was the President & CEO of Transglobal Financial Services, Inc. ("TFS") a Florida corporation formed on or about September 19, 2000, and the President/CEO of M&P Global Financial Services, Incorporated ("M&P") which was a Florida corporation formed on or about September 11, 1997.

c) From 2001 through 2013, Senol Taskin was M&P's Senior Vice President and Greenberg's business partner. Maulyn Trading was a Canadian based import/export company owned and operated by Taskin.

d) From 2002 through 2013, KANE was a certified public accountant who was the Managing Partner of GFF8, a limited liability partnership formed on October 3, 2000, in the State of Nevada as an investment vehicle for its shareholders.

e) After GFF8 had raised $10 million in principal funds, Greenberg, d/b/a as TFS and M&P entered into three agreements with GFF8. These agreements guaranteed GFF8 investors that their investment would never be at risk of losing money and that the GFF8 principal would always be under the control of the GFF8 designees who at the time were KANE and S.N. These three agreements were as follows:

    1)    On January 23, 2001, Greenberg d/b/a TFS and M&P entered into a Limited Power of Attorney with GFF8, signed by KANE and S.N. on behalf of GFF8, in which Greenberg guaranteed GFF8 investors "that at no times" would their "funds be at risk of loss or lien."

5

2) On February 6, 2001, Greenberg d/b/a TFS and M&P entered into an Investment Management Agreement with GFF8 which promised that the GFF8 principal would always be under the signatory control of the investors' designees who at that time were KANE and S.N.

3)     In March 2001, KANE and S.N. on behalf of GFF8 entered into an Investment Management Agreement Addendum with Greenberg d/b/a TFS and M&P, which promised GFF8 that its principal investment was in a "secured program" and claimed that the return on investment would be 960%.

f)  After executing these agreements, in March 2001, Greenberg directed KANE and S.N. to transfer the GFF8 principal to a bank account in Italy.  Greenberg and Taskin then directed unauthorized trades using the GFF8 principal resulting in a loss of approximately $600,000.   These trades violated the Investment Management Agreement, Investment Management Agreement Addendum and Limited Power of Attorney all which promised that the GFF8 principal would always be under the control of KANE and S.N. and not be at "risk of loss or lien."

g)  In 2001, KANE learned of the trading losses because he received the bank account statements for the Italian bank account, but he told investors that the GFF8 principal remained untouched when, as he then well knew, investors had lost $600,000 in unauthorized trades.

h)  In 2002, S.N. questioned Greenberg about his handling of GFF8 funds and demanded a return of the $600,000 in lost GFF8 funds.  In response, Greenberg directed KANE to remove S.N. as Managing Partner and signatory of GFF8, and KANE became Managing Partner of GFF8 and had sole signatory authority over GFF8 accounts.

6

i) In August of 2003, KANE at the direction of Greenberg and Taskin transferred the remaining GFF8 principal from an account in the name GFF8 in the United States to personal bank accounts in KANE's name in Canada. KANE transferred $9.4 million on August 13, 2003 from an account in the name GFF8 in the United States to personal bank accounts in KANE's name at TD Bank in Canada.

j) On September 9, 2003, KANE at the direction of Greenberg and Taskin executed a Power of Attorney granting Taskin access to the $9.4 million in GFF8 principal on deposit at TD Bank in Canada. Both Greenberg and Taskin approved of this course of action before KANE executed the Power of Attorney.

k) From September 16, 2003 to October 6, 2003, Taskin wired $7.4 million in GFF8 principal from KANE's TD Bank in Canada to a TD Bank account held in the name of Maulyn Trading, a company owned and operated by Taskin.

l) On May 20, 2004, Taskin transferred approximately $7.4 million of GFF8 principal from the Maulyn Account held in Canada to a personal bank account in Italy held in Taskin's name.

m) From December 2003 through November of 2006, Greenberg, Taskin and KANE for their own benefit and without authorization, improperly diverted approximately $6.1 million of GFF8 principal to themselves and their close relatives. Some examples of these diversions include:

   (1) KANE used investor funds to pay more than $280,000 in credit card payments, more than $49,500 in automobile and lease payments, make more than $148,000 in waterfront condominium rental payments in Florida, repay more than $235,000 in personal bank loans and purchase a $59,000 boat.

7

**Lulling E-Mails**

n) From 2004 to 2013, Greenberg, Taskin and KANE made and caused to be made false and fraudulent representations and promises to investors by sending emails to the investors and their representatives which were designed to lull them into a false sense of security that the GFF8 Principal was in an Italian bank account and had generated significant profits, when as they then well knew, Greenberg, Taskin and KANE had improperly diverted and continued to improperly divert the GFF8 Principal for their own use and personal enrichment.  The purpose of these e-mails was to lull the investors into a false sense of security, postpone their ultimate complaint to authorities, and therefore make the apprehension of the defendants less likely than if no emails had been sent.  Some examples of this coordinated lulling conduct is set forth below:

(1) In May 2004, in preparation for a June 2004 meeting that KANE was having with GFF8 investors, Taskin created a fake bank statement showing over $10 million held in a TD Bank account in Canada in the name "GFFL".  On May 28, 2004, Taskin e-mailed the fake bank statement to Greenberg who praised its creation.  On June 2, 2004, Greenberg sent an e-mail to Taskin stating that he was meeting with KANE that day and was "going to try to convince" KANE to use the fake bank statement at his investor meeting in New York.  On June 6, 2004, KANE e-mailed Greenberg and told him that he had used the bank statement at a meeting with some investors and that it "was very calming" to the investors.

(2) On June 7, 2004, Greenberg sent an e-mail to Taskin stating that KANE had gotten a "reprieve" from the investors and forwarding questions about the investment that the GFF8 investors asked at the meeting with KANE.  On June 9, 2004, Taskin e-mailed

8

Greenberg and provided him with fraudulent lulling responses for KANE to give to the GFF8 investors.

**The Coordination of Lulling Profit Payments**

o) From October 2004 to November 2005, Greenberg, Taskin and KANE concealed the improper diversion of the GFF8 principal by making and causing to be made over $1.7 million of phony "profit" payments to investors using GFF8 principal to lull investors into believing that the GFF8 principal was invested properly and was profitable. Greenberg, Taskin and KANE accomplished this task by transferring GFF8 principal funds through numerous accounts they controlled and ultimately having a portion of these funds deposited back into an account maintained by KANE in the United States at Bank of America which was held in the name of GFF8. The transfers used to facilitate these lulling payments are set forth below:

(1) From September 9, 2004 to September 27, 2004, Taskin transferred over $8 million in GFF8 principal from Taskin's bank account in Italy to Taskin's Refco account in the United States.

(2) From November 22, 2004 to March 11, 2005, Taskin transferred over $1.6 million in GFF8 principal from Taskin's Refco account to Greenberg's M&P account at Wachovia Bank.

(3) From August 25, 2004 to October 13, 2004, Taskin transferred over $340,000 in GFF8 principal from Taskin's bank account in Italy to Greenberg's M&P account at Wachovia Bank in the United States.

(4) From April 6, 2005 to June 21, 2005, Taskin transferred over $300,000 in GFF8 principal from Taskin's Refco to KANE's TD Bank account.

9

(5) From August 16, 2004 to January 31, 2005, KANE transferred over $200,000 in GFF8 principal from one of KANE's TD Bank accounts to another Kane TD Bank Account.

(6) From September 17, 2004, to August 24, 2005, Greenberg transferred over $1.2 million in GFF8 principal from M&P's Wachovia Account to KANE's TD Bank account.

(7) From October 12, 2004 to October 31, 2005, KANE and Taskin transferred over $1.7 million in GFF8 principal from one of KANE's TD Bank accounts in Canada to a Bank of America account in the United States maintained by KANE and held in the name of GFF8.  KANE then used the Bank of America account to make the phony "profit" payment distributions to GFF8 investors.

p) Of the original $10 million of GFF8 Principal, only $1.7 million remains in an Italian bank account held in the name of Taskin that was frozen by the Italian Government in November of 2004.

q) Of the original $10 million GFF8 investment KANE misappropriated approximately $1.5 million for his own personal use and unjust enrichment.

6)  **Sentencing Stipulations:**

a) The base offense level is 7 pursuant to U.S.S.G. § 2B1.1(a)(2);

b) The government reserves the right to advocate at sentencing that the loss amount exceeded $9.5 million but was less than $25 million resulting in an increase to the base offense level of an additional 20 levels pursuant to U.S.S.G. § 2B1.1(b)(1)(K).  The defendant reserves the right to advocate at sentencing that the loss amount exceeded $3.5

10

million but was less than $9.5 million resulting in an increase to the base offense level of an additional 18 levels pursuant to U.S.S.G. § 2B1.1(b)(1)(J);

c)  The parties agree that the number of victims exceeds 10 but is less than 50 resulting in an increase to the base offense level of an additional 2 levels pursuant to U.S.S.G. § 2B1.1(2)(A);

d)  The parties agree that a 2-level increase applies for a substantial part of the scheme being committed from outside the United States or involving sophisticated means pursuant to U.S.S.G. § 2B1.1(10);

e)  The parties agree that a 2-level increase applies for Abuse of Position of Trust or Use of Special Skill pursuant to U.S.S.G. § 3B1.3;

f)  The parties reserve the right to advocate at sentencing the application of any remaining guideline provisions not specifically stipulated to in this agreement;

g)  The government will recommend a 2-level downward adjustment to the applicable federal sentencing guidelines offense level pursuant to U.S.S.G. §3E1.1(a) if, (i) through the time of sentencing, the government is convinced that the defendant has demonstrated "acceptance of  responsibility" for the offense(s) to which the defendant is pleading guilty and all relevant conduct, as defined in U.S.S.G. § 1B1.3; and (ii) the government does not determine that the defendant, after signing this agreement, committed any other federal, state, or local crimes, or engaged in conduct that constitutes "obstruction of justice," as defined in U.S.S.G. §3C1.1.

h)  The government will move for a 1-level downward adjustment to the applicable federal sentencing guidelines offense level pursuant to U.S.S.G. §3E1.1(b) if the government is convinced that the defendant has accepted responsibility within the meaning of U.S.S.G.

§3E1.1(a) and further assisted authorities in the investigation or prosecution of the defendant's own misconduct by timely notifying authorities of the defendant's intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently, and the defendant otherwise qualifies for such adjustment by having a combined offense level of 16 or more before receipt of any acceptance of responsibility adjustment under U.S.S.G. §3E1.1(a).

7)     **Waiver of Rights to Appeal and Collateral Attack:** The defendant waives (gives up) any and all rights, including those conferred by 18 U.S.C. § 3742 and/or 28 U.S.C. §§ 2241 and 2255, to appeal and/or to collaterally attack the following (except that the defendant does not waive the right to raise a claim based on alleged ineffective assistance of counsel):

   a)  The conviction resulting from the defendant's guilty plea;

   b)  Any sentence to a term of imprisonment of 121 months or less;

   c)  Any sentence to a fine within the maximum permitted by law;

   d)  Any sentence to a term of supervised release within the maximum permitted by law;

   e)  Any order of forfeiture or restitution imposed by the Court that is consistent with governing law and is not contrary to the terms of this agreement.

Nothing in this appeal waiver is meant to be or should be construed as a representation of or agreement concerning the appropriate sentence in this case.

---

A.  **Right to Counsel:** The defendant has a right to assistance of counsel in connection with settlement of this case and understands that right.   Defense counsel has advised the

defendant of nature of the charges to which the defendant is agreeing to plead guilty and the range of possible sentences.

B. **Waiver of Trial-Related Rights:** The defendant has the following additional constitutional rights in connection with the charges in this case: (i) to be presumed innocent until proven guilty beyond a reasonable doubt; (ii) to plead not guilty; (iii) to trial by jury; (iv) to confront, cross-examine, and compel the attendance of witnesses at trial; (v) to present defense evidence; and (vi) to remain silent and be protected against compelled self-incrimination. The defendant understands that by pleading guilty, the defendant waives (gives up) these rights.

C. **Court Not Bound by Plea Agreement:** This plea agreement is made pursuant to Rule 11(c)(1)(A) of the Federal Rules of Criminal Procedure. The Court is neither a party to, nor bound by this Plea Agreement. The Court may accept or reject this Plea Agreement or defer a decision until it has considered the Presentence Investigation Report prepared by the United States Probation Office. If the Court rejects the provisions of this agreement permitting the defendant to plead guilty to certain charges in satisfaction of other charges, the Court will permit the defendant to withdraw the plea of guilty before sentencing, pursuant to Fed. R. Crim. P. 11(c)(5) & (d).

D. **Court Not Bound by Agreed-Upon Recommendations, Stipulations, and Requests:** If this agreement contains any provisions under Fed. R. Crim. P. 11(c)(1)(B) by which the government agrees to recommend, stipulates, or agrees not to oppose the defendant's request, that a particular sentence or sentencing range is appropriate or that a particular provision of the federal sentencing guidelines, or a policy statement, or sentencing factor does or does not apply, such a recommendation, stipulation, or request does not bind the Court, which may

13

make independent factual findings by a preponderance of the evidence and may reject such recommendations, requests, and stipulations between the parties. If the Court rejects one or more recommendations, stipulations, or requests, the defendant is not entitled to withdraw the defendant's plea of guilty and is not released from the obligations described in this agreement. Under such circumstances, the government reserves the right to support and defend, in connection with any post-sentencing proceedings, any decision the Court may make with regard to the defendant's sentence, whether or not such decision is consistent with the government's recommendations, stipulations, or requests set out in this agreement.

E. **Sentencing:**

a. **Maximum terms of imprisonment:** The defendant understands that the Court has discretion to impose a sentence within the statutory maximum sentence(s) set out in this agreement. If the defendant is pleading guilty to multiple charges, the Court may be required by law to have the sentences of imprisonment on the convictions resulting from those charges run consecutively to each other. Otherwise, the Court has discretion to have sentences of imprisonment run concurrently or consecutively. *See* 18 U.S.C. § 3584.

b. **Mandatory minimum terms of imprisonment:** If specified in this agreement, the conviction on one or more charges to which the defendant has agreed to plead guilty may require imposition of a mandatory minimum term of imprisonment. In such cases, the court must impose a term of imprisonment no less than the required mandatory minimum term unless an exception to that requirement applies. Such exception may be dependent on a motion by the government.

c. **Section 851 Enhancements**: The defendant understands that if the government has filed an information against the defendant as provided 21 U.S.C. § 851, alleging that the defendant has one or more final convictions for a felony drug offense, and, as part of this agreement, the defendant has admitted and/or affirmed that the defendant was so convicted, then, by pleading guilty, the defendant will lose the right to attack any sentence the court imposes by challenging any such prior conviction.

d. **Sentencing guidelines:**

   i. The actual sentence to be imposed upon the defendant is within the discretion of the sentencing Court, subject to the statutory maximum and mandatory minimum penalties, as described above, and the provisions of the Sentencing Reform Act and the United States Sentencing Guidelines promulgated thereunder.  While the Court is not bound to impose a sentence within the applicable sentencing guidelines range, it must take into account the sentencing guidelines, along with the other factors set forth in 18 U.S.C. § 3553(a).

   ii. Any estimate of the defendant's offense level, criminal history category, and sentencing guidelines range provided before sentencing is preliminary and is not binding on the parties to this agreement, the Probation Office, or the Court.  Until the Probation Office has fully investigated the defendant's criminal history, it is not possible to predict with certainty the defendant's criminal history category and, in some cases, the defendant's offense level.

   iii. Under certain circumstances, the defendant's criminal history may affect the defendant's offense level under the federal sentencing guidelines.  If the presentence investigation reveals that the defendant's criminal history may support an offense

15

level different than an offense level stipulated in this agreement, the parties are not bound by any such stipulation as to the defendant's offense level and may advocate with respect to how the defendant's criminal history affects the offense level.

e. **Factual findings:**  The defendant understands that the sentencing Court may make factual findings with respect to any and all sentencing factors and issues, including those referenced in the United States Sentencing Guidelines, whether or not such factors or issues have been admitted by the defendant or stipulated by the parties.  In making those findings by a preponderance of the evidence, the Court may consider any reliable evidence, including hearsay.  The Defendant understands that the sentence imposed may be determined based upon such judicial fact-finding.

f. **Use of the Defendant's Statements:** The defendant understands that the sentencing court may consider any statement that the defendant has made or makes in this Plea Agreement, during the guilty plea, to the Probation Office, and at sentencing when imposing sentence.  In addition the government may be able to use the defendant's statements in this agreement and at the guilty plea and at sentencing in any criminal, civil, or administrative proceeding.  For example, if the defendant fails to enter a guilty plea (as required by this agreement) or the defendant's guilty plea is later withdrawn or vacated for any reason other than the Court's rejection of this Plea Agreement under Fed. R. Crim. P. 11(c)(5), the government may introduce the defendant's statements into evidence in any prosecution.  If, however, the Court rejects this Plea Agreement under Fed. R. Crim. P. 11(c)(5), and the defendant withdraws the guilty plea pursuant to Fed. R. Crim. P. 11(d)(2)(A), the government will not be permitted to use any of the defendant's statements in this Plea Agreement.  To the extent that Rule 11(f) of the Federal Rules of

16

Criminal Procedure and/or Rule 410 of the Federal Rules of Evidence are inconsistent with this paragraph, the defendant waives (gives up) any protections under those rules.

g. **Government's Discretion to Recommend a Sentence:**   Unless a stipulation in this agreement explicitly limits the government's discretion with respect to its recommendations at sentencing, this agreement does not prevent the government from urging the sentencing Court to find that a particular offense level, criminal history category, ground for departure, or guidelines range applies; from recommending a specific sentence within the applicable guidelines range as determined by the Court or as urged by the government; or, if the government deems appropriate, recommending that the Court impose a sentence above the applicable guidelines range.

h. **Sentencing-Related Information:**   The government has the right to advise the sentencing Court and the Probation Office of any information, in aggravation or mitigation of sentencing, whether or not encompassed within the count(s) to which the defendant has agreed to plead guilty, subject only to the limitation described in U.S.S.G. §1B1.8.  No stipulation in this plea agreement limits the obligations of both parties to ensure that the sentencing Court has all information pertinent to its determination of an appropriate sentence.   The parties may provide any factual information relevant to sentencing to the Probation Office and/or to the Court, without limitation, before or after the completion of the Presentence Investigation Report.   The parties agree that the submission of such information shall not be deemed "advocacy" in violation of any stipulation in this plea agreement.

i. **Supervised Release Term and Conditions:** If the defendant is placed on supervised release, under some circumstances, including the defendant's violation of one or more

17

supervised release conditions, the Court may extend the term of supervised release, and may modify, reduce, or enlarge the conditions of such release.

F. **Other Adverse Consequences:** The following are some examples of the adverse consequences of pleading guilty other than the sentence imposed by the Court, along with any judicial order of forfeiture and/or restitution:

a. Conviction of a felony may result in the loss of civil rights, including, but not limited to, the right to vote and the right to possess firearms.

b. If the defendant is not a United States citizen, such conviction may result in deportation or removal from the United States, may bar readmission to the United States if the defendant leaves the country, and may result in a denial of a pending or future application for citizenship. Under federal law, removal or deportation may be an almost certain consequence of a conviction for a broad range of federal offenses, including, but not limited to, aggravated felonies, as defined in 8 U.S.C. § 1101(a)(43), and crimes of moral turpitude, which includes crimes involving fraud. Removal and other immigration consequences are the subject of a separate proceeding. No one, including the defendant's attorney and the Court, can predict with certainty the effect of the conviction resulting from this agreement on the defendant's immigration status. The defendant understands this uncertainty and nonetheless wishes to plead guilty regardless of any immigration consequences that the guilty plea may entail, even if the consequence is the defendant's automatic removal from the United States.

c. A felony conviction may adversely affect the defendant's ability to hold certain professional licenses and may impair the defendant's ability to do business with federal, state, and local governments or to receive benefits from such governments.

There may be other adverse consequences as well, some of them unforeseeable. It may be difficult or impossible to predict all of the adverse consequences of the defendant's guilty plea. The defendant agrees that any resulting adverse consequences, whether or not foreseen or foreseeable, will not provide a basis for withdrawing from the guilty plea described in this agreement or otherwise challenging the resulting conviction and sentence.

G. **Restitution:** Independent of any agreement to pay restitution, and whether there is any such agreement, the sentencing Court may be required to order that the defendant pay restitution to any victim of the offense(s) of conviction under the Mandatory Victim Restitution Act, 18 U.S.C. § 3663A. In addition, the sentencing Court may have the authority to order that the defendant pay restitution to any victim of the offense(s) of conviction pursuant to 18 U.S.C. §§ 3663 & 3664. In any case involving a conviction for a sexual exploitation offense in chapter 110 of title 18 of the United States Code, the Court must order restitution for the full amount of the victim's losses as determined by the court. The victim's losses include, but are not limited to medical services related to physical, psychiatric, or psychological care; physical or occupational therapy or rehabilitation; necessary transportation, temporary housing, and child care expenses; lost income; attorney's fees and other costs; and any other losses suffered by the victim as a proximate result of the offense. The restitution payment will be in addition to any other civil or criminal penalty authorized by law.

H. **Forfeiture:** If the defendant has agreed to forfeiture of assets, the defendant agrees to the following terms and conditions:

a.  The defendant hereby forfeits, to the United States, all right, title, and interest of any nature in any and all assets that are subject to forfeiture, including substitute assets, as set forth above, whether those assets are in the possession or control of the defendant, a nominee, or some other third party.

b.  The defendant consents to the entry of an order of forfeiture of the assets described above.

c.  The defendant is aware that pursuant to Rule 32.2(b)(4)(A) of the Federal Rules of Criminal Procedure, a preliminary order of forfeiture becomes final as to a given defendant at sentencing or at any time before sentencing if the defendant consents.  The defendant consents that the preliminary order of forfeiture in this case shall become final as to the defendant before sentencing, as of the date the preliminary order of forfeiture is entered by the Court.  The defendant understands that the government, upon entry of the preliminary order of forfeiture, will address any potential third party claims pursuant to Rule 32.2(c), and seek to finalize forfeiture.

d.  Forfeiture of the defendant's assets will not satisfy all, or any portion of, a fine, restitution, or other monetary penalty that the Court may impose upon the defendant in addition to forfeiture.  Satisfaction of all, or any portion of, any restitution, fine, or other penalty that the Court may impose upon the defendant in addition to forfeiture will not satisfy all, or any portion of, any forfeiture judgment ordered by the Court.

e.  In the event that any successful claim is made, by any third party, to the assets described above, the defendant agrees to forfeit substitute assets equal in value to the assets transferred to any such third party.  The defendant agrees that forfeiture of substitute assets shall not be deemed an alteration of the Defendant's sentence.

f.  The defendant agrees to cooperate with the United States by taking whatever steps are necessary to pass clear title to the United States of any forfeitable assets, including but not limited to, surrendering title; completing any documents or legal proceedings required to transfer assets to the United States; and taking necessary steps to ensure that assets subject to forfeiture are not sold, disbursed, expended, destroyed, damaged, hidden or otherwise made unavailable for forfeiture or removed beyond the jurisdiction of the Court.

g.  The defendant waives the right to a jury trial on the forfeiture of assets.  The defendant waives all constitutional, legal, and equitable defenses to the forfeiture of assets, as provided by this agreement, in any proceeding, including but not limited to any jeopardy defense or claim of double jeopardy or any claim or defense under the Eighth Amendment to the United States Constitution, including any claim of an excessive fine.

h.  The defendant acknowledges that the government may institute civil or administrative proceedings against any or all of the defendant's forfeitable assets, including, but not limited to substitute assets and any forfeitable assets not identified by the defendant, and agrees not to contest any such forfeiture proceedings.

i.  The defendant represents and warrants that the defendant has no direct or indirect interest in any property, real or personal, or other asset subject to forfeiture by virtue of this plea agreement, other than those listed above.

j.  The defendant acknowledges joint and several liability for the amount of any money judgment set forth above.

k.  In the event the government determines that the defendant has breached any condition of this plea agreement, none of the forfeited property shall be returned to the defendant, nor

shall the defendant assert any claim to the forfeited property. The defendant shall not reacquire any forfeited property, directly or indirectly, through family members, nominees, friends, or associates.

**I.   Determination of Financial Condition and Payment of Interest and Penalties:**

    a.  In order to facilitate the collection of financial obligations to be imposed in connection with this prosecution, the defendant agrees fully to disclose all assets in which the defendant has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, nominee, or other third party.

    b.  The defendant will promptly submit a complete, accurate, and truthful financial statement to the United States Attorney's Office, in a form it provides and as it directs.

    c.  The defendant authorizes the United States Attorney's Office to obtain a credit report on the defendant in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

    d.  Interest and penalties may accrue, as a matter of law, on any unpaid financial obligation imposed as part of the defendant's sentence, from as early as the date of sentencing.

**J.   Remedies for Breach:**

    a.  Should the government determine that the defendant, after the date the defendant has signed this plea agreement, (i) has committed any further crime or violated any condition of release or supervision imposed by the Court (whether or not charged); (ii) has given false, incomplete, or misleading testimony or information; or (iii) has moved to withdraw the defendant's guilty plea for reasons other than those described in this agreement or otherwise has breached any term or condition of this plea agreement or supplemental agreements with the government, the government will have the right, in its sole

discretion, to void this agreement, in whole or in part. In the event of such breach, the defendant will remain obligated to plead guilty and otherwise comply with the terms of this agreement and will not be permitted to withdraw the defendant's guilty plea under this agreement. The defendant will be subject to prosecution for any federal criminal violation of which the government has knowledge, including but not limited to charges that this Office has agreed to dismiss or not to prosecute under this agreement.

b. If the defendant breaches this agreement, the government will have the following remedies, among others, available to it:

    i. To bring prosecution for any federal criminal offenses dismissed or not prosecuted under this agreement. The defendant waives (gives up) any defense or objection to the commencement of any such prosecution that is not time-barred by the applicable statute of limitations as of the date on which the defendant signed this plea agreement, notwithstanding the expiration of the statute of limitations between the signing of the agreement and the commencement of any such prosecution.

    ii. In connection with any such prosecution, any information, statement, and testimony provided by the defendant, and all leads derived therefrom, may be used against the defendant, without limitation and without regard to any rights the defendant may have under Fed. R. Crim. P. 11(f) and Fed. R. Evid. 410.

    iii. To utilize any information, statement, or testimony provided by the defendant in any proceeding, including at sentencing, notwithstanding U.S.S.G. §1B1.8;

    iv. To advocate if, and how, any particular adjustment or specific offense characteristic affects the applicable Sentencing Guidelines range without regard to any contrary stipulations contained in this agreement;

    v. To refrain from making any sentencing-related motion favorable to the defendant without regard to any provision in this agreement obligating the government to consider making or make such motion upon fulfillment of certain conditions;

    vi. To urge the sentencing Court to take the defendant's breach into account when imposing sentence;

    vii. To recommend any sentence the government deems appropriate, even if such recommendation is at odds with any stipulation in this agreement.

K. **Limitations:** This agreement is between the United States Attorney's Office for the Northern District of New York and the defendant. References to "the government" in this agreement refer only to that Office. This agreement does not bind any other federal, state, or local prosecuting authorities. Furthermore, this agreement does not prohibit the United States, any agency thereof, or any third party from initiating or prosecuting any civil or administrative proceedings directly or indirectly involving the defendant, including, but not limited to, proceedings by the Internal Revenue Service relating to potential civil tax liability, proceedings relating to the forfeiture of assets, and proceedings by the Department of Homeland Security, Bureau of Citizenship and Immigration Services relating to the immigration status of the defendant.

L. **Agreement Must be Signed; Modifications Must be Written or on the Record:** This agreement, to become effective, must be signed by all of the parties listed below. No promises, agreements, terms, or conditions other than those set forth in this plea agreement will be effective unless memorialized in writing and signed by all parties or confirmed on the record before the Court.

M. **Agreement to Plead Guilty Voluntary:** The defendant acknowledges reading each of the provisions of this plea agreement with the assistance of counsel and understands its provisions. The defendant further acknowledges that the defendant's agreement to plead guilty is voluntary and did not result from any force, threat, or promises (other than the promises in this plea agreement and any written supplemental agreements or amendments).

RICHARD S. HARTUNIAN
United States Attorney

_____          ___6 / 9 / 2016___
Geoffrey J. L. Brown                              Date
Assistant United States Attorney
Bar Roll No. 513495

_____          ___6\8\2016___
BRUCE KANE                                        Date
Defendant

_____          ___6\8\2016___
Robert G. Wells                                   Date
Attorney for Defendant
Bar Roll No.

25